SIGAL CHATTAH, ESQ.
Nevada Bar No.: 8264
CHATTAH LAW GROUP
5875 S. Rainbow Blvd. #205
Las Vegas, Nevada 89118
Tel: (702) 360-6200
Fax: (702) 643-6292
Chattahlaw@gmail.com

JASON C. GREAVES, ESQ. (*pro hac vice*)
JARED J. ROBERTS, ESQ. (*pro hac vice*)
Binnall Law Group, PLLC
717 King Street, Suite 200
Alexandria, Virginia 22314
Tel: (703) 888-1943
Fax: (703) 888-1930
jason@binnall.com
jared@binnall.com

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| KASHYAP P. PATEL *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>JIM STEWARTSON,<br><br>Defendant. | Case No.: **2:23-cv-873-APG-NJK**<br><br>**PLAINTIFFS' RESPONSE TO<br>ORDER TO ECF 32** |

**RESPONSE**

COME NOW, Plaintiffs KASHYAP P. PATEL et al, by and through undersigned

Counsel, SIGAL CHATTAH, ESQ of CHATTAH LAW GROUP and BINNAL LAW GROUP,

PLLC, and hereby submits Plaintiffs' Exhibit B in response to ECF 32.

Dated: March 26, 2025

Respectfully submitted,
/s/*Sigal Chattah*
Sigal Chattah, Esq.
NV Bar No. 8264
CHATTAH LAW GROUP
5875 S. Rainbow Blvd. #205
Las Vegas, Nevada 89118
Tel: (702) 360-6200
Fax: (702) 643-6292
Chattahlaw@gmail.com

Jason C. Greaves (*pro hac vice*)
Jared J. Roberts (*pro hac vice*)
BINNALL LAW GROUP, PLLC
717 King Street, Suite 200
Alexandria, Virginia 22314
Phone: (703) 888-1943
Fax: (703) 888-1930
Email: jason@binnall.com
        jared@binnall.com

*Counsel for Plaintiffs*

# EXHIBIT "B"

**Online Reputation & Damages Assessment**

**Expert Witness Report**

**Regarding:**

Kashyap P. Patel & the KASH Foundation, Inc.

*Plaintiffs*

v.

Jim Stewartson

*Defendant*

**Prepared By:**

Sameer Somal, CFA

CEO, Blue Ocean Global Technology LLC,

March 26th, 2025

## TABLE OF CONTENTS

SECTION 1: EXPERT WITNESS ENGAGEMENT & BASIC FINDINGS .................................................4

Engagement Summary ...............................................................................................................5
Basic Findings and Conclusions ..............................................................................................6

SECTION 2: EXPERT WITNESS QUALIFICATIONS.......................................................................7

Sameer Somal Biography ..........................................................................................................8
About Blue Ocean Global Technology ...................................................................................9
Statement of Compensation ....................................................................................................10

SECTION 3: DEFAMATION & ITS IMPACT ON THE REPUTATION* .................................... 11

False Allegations Amounting to Defamation ........................................................................ 12
Defamation Vs. Freedom of Expression................................................................................ 15
Internet Defamation and Related Harm ................................................................................ 17
Online and Social Media Defamation of Mr. Kashyap Patel and Kash Foundation........ 19
Malice involved in case of Negative and Defamatory Statement........................................ 22

SECTION 4: HEIGHTENED SCRUTINY & REPUTATION SENSITIVITY IN CASE OF PUBLIC
OFFICE/SOCIAL IMPACT INDUSTRY* ....................................................................................... 24

Significance of trust and image for those in public office....................................................... 25
Harm to the Social Work and Business Disparagement of Kash Foundation ................... 27

SECTION 5: THE NUANCES OF DIGITAL REPUTATION REPAIR ........................................ 28

What is Online Reputation Management (ORM)................................................................... 29
Building a Positive Reputation ............................................................................................... 30
Monitoring Online Mentions .................................................................................................. 32
Removal of content .................................................................................................................. 34
Repairing a Damaged Reputation ........................................................................................... 35

SECTION 6: LEGAL CASES......................................................................................................... 38

INTERNET DEFAMATION CASES..................................................................................................39

DEFAMATION PER SE CASES....................................................................................................45

BUSINESS DISPARAGEMENT CASES .........................................................................................48

**SECTION 7: ASSESSMENT OF DAMAGES** .........................................................................**50**

RATIONALE FOR RECOMMENDATION OF DAMAGES ...............................................................51

SUMMARY FINDINGS...............................................................................................................52

DAMAGES.................................................................................................................................56

## Section 1: Expert Witness Engagement & Basic Findings

Engagement Summary

Basic Findings and Conclusions

## Engagement Summary

Mr. Jason Greaves and Mr. Shawn Flynn, attorneys at Binnall Law Group engaged me to ascertain the damages associated with the defamatory campaign orchestrated by the Defendant, Jim Stewartson against their clients, Mr. Kashyap P. Patel and Kash Foundation, on multiple platforms including Twitter (X), Substack, and Youtube, according Mr. Patel, among other allegation, of sedition and treason while holding public office.

A large portion of my professional time as CEO of Blue Ocean Global Technology is spent on actual digital reputation client situations. As such, I feel confident in my ability to approach this case from the lens of both an expert witness and a professional with a track record of successfully mitigating reputational damages originating from false or defamatory statements published on the internet. As a digital reputation expert, I apply my cumulative knowledge and experience to assess an individual's damages and recommend the appropriate course of action to remediate damages moving forward.

## Basic Findings and Conclusions

After a thorough analysis of the malicious posts generated surrounding Mr. Kashyap P Patel and nonprofit organization, Kash Foundation, my basic findings and conclusions are:

Mr. Patel and Kash Foundation have incurred significant damages resulting from the defamatory, cancel culture style postings made by Mr. Stewartson consisting of: (a) Economic, (b) Reputation, and (c) Rehabilitative damages a breakdown of all damages total:

**Economic Damages: in the form of lost business, donors, and opportunities as the court deems fit.**

**Reputational Damages: in the range of $1,500,000 - $2,000,000.**

**Rehabilitation Damages: $45,000 - $50,000/monthly for a period ranging between 18 - 24 months = In the Range of $810,000 - $1,200,000.**

**Section 2: Expert Witness Qualifications**

Sameer Somal Biography

About Blue Ocean Global Technology

Statement of Compensation

## Sameer Somal Biography

Sameer Somal is the CEO of Blue Ocean Global Technology and Co-Founder of Girl Power Talk. He is a CFA Charterholder, a CFP® professional, and a Chartered Alternative Investment AnalystSM. Sameer leads client engagements on digital transformation, risk management, and technology development.

As a testifying subject matter expert witness in economic damages, intellectual property, and internet defamation, he has authored CLE programs with the Philadelphia Bar Foundation. Sameer is a frequent speaker at private industry and public sector conferences, including engagements with the Federal Home Loan Bank (FHLB), Global Digital Marketing Summit, IBM, New York State Bar Association (NYBSA), US Defense Leadership Forum, and US State Department's Foreign Service Institute.

He proudly serves on the Board of Directors of Future Business Leaders of America (FBLA) and Girl Power USA. Committed to building relationships, Sameer is an active member of the Abraham Lincoln Association (ALA), Academy of Legal Studies in Business (ALSB), American Bar Association (ABA), American Marketing Association (AMA), Business Transition Council, International Trademark Association (INTA), and Society of International Business Fellows (SIBF). A graduate of Georgetown University, he held leadership roles at Bank of America, Morgan Stanley, and Scotiabank. Sameer is also a CFA Institute 2022 Inspirational Leader Award recipient and was named an Iconic Leader by the Women Economic Forum.

## About Blue Ocean Global Technology

Blue Ocean Global Technology is a team of global professionals committed to learning, excellence, and helping our clients — both individuals and entities — achieve optimal results when it comes to repairing, building, and protecting their online reputation.

Blue Ocean Global Technology creates and promotes top digital assets that accelerate growth and brand equity. We effectuate comprehensive reputation management services, which often include Search Engine Optimization (SEO), Social Media Marketing (SMM), and web development. When an individual or organization faces a reputation crisis, or legal or public relations issues that involve the internet, we specialize in mitigating the impact of the defamatory content and repairing the negative reputational damages.

## Statement of Compensation

Sameer is compensated at $595/hour, which covers research, investigation, testing, analysis, writing, reading, interviewing, responding, and time required to author his expert witness report. All payments are made to Blue Ocean Global Technology, LLC.

**Section 3: Defamation & its Impact on the Reputation***

False Allegations amounting to Defamation

Defamation Vs. Freedom Of Expression

Internet Defamation and Related Harm

Online and Social Media Defamation of Mr. Kashyap Patel and Kash Foundation

Malice involved in case of Negative and Defamatory Statement

*Disclaimer: Please note that I am not making any legal conclusions and/or providing any legal advice. All information, content, and materials available hereunder are for informational purposes only, in furtherance of the expert testimony being provided.*

## False Allegations Amounting to Defamation

Defamation comprises three elements: (i) a false statement, (ii) publication or communication of the false statement to third parties, and (iii) harm suffered by the aggrieved party against whom the false statement was made.

When untrue claims are spread to a third party, damaging the reputation of the person or organization being attacked, this is known as defamation. Under certain circumstances, false allegations can be termed as defamation too, when it harms the reputation of the victim to the public at large and results in the victim suffering economically and mentally.

Defamation has been dealt with under Title 15 (Crimes and Punishments), Nevada Revised Statutes of 2022. More specifically, the state legislation, through NV Rev Stat § 200.510 (2022), criminalizes libel, which is defamation through publication of written or printed words. Publication has notably been given a very wide definition in NV Rev Stat § 200.520 (2022) – communication to another person by any method. It also holds individual editors or publications of corporations personally liable by piercing the corporate veil, but affords them an opportunity of defense in claiming that such publication was made without their knowledge. It also provides that a citizen of Nevada accused of publishing such libelous content may be tried in any country where such publication was made, but no more than one country can try such a person, lest it amount to double jeopardy. According to NV Rev Stat § 200.550 (2022) and NV Rev Stat § 200.560 (2022), the guilt associated with such publication may be that of misdemeanor or gross misdemeanor, depending on the intensity of the impact.

Although false allegations can sometimes overlap with defamation, not all false allegations necessarily constitute defamation. Defamation involves not just false statements but also the element of harm to one's reputation. In some cases, false allegations may not rise to the level of defamation if they do not meet the legal criteria for causing harm or if they are not communicated to a third party. Whether they are made maliciously or carelessly, false

accusations have the power to destroy the reputation of a person or organization, harming their personal and professional lives.

False allegations can take many different forms when it comes to defamation law, such as libel (written defamation) and slander (spoken defamation). The victim may suffer serious financial, psychological, and social repercussions as a result of the public disclosure of these accusations, which may be related to criminal activity, unethical behavior, ineptitude, or other bad traits.

False accusations can be made maliciously with the intention of damaging the accused person's reputation or gaining an advantage. However, if inadvertent false comments satisfy the requirements for proving defamation—such as being disclosed to a third person and harming the plaintiff's reputation—they may still give rise to defamation claims.

In order to establish defamation, the plaintiff usually has to show that the false remarks were made without privilege or reason, were published, harmed their reputation, and caused them to be disseminated. In the era of social media and online communication, where information spreads quickly and widely and it might be difficult to lessen the harm caused by defamatory remarks, false accusations can be especially harmful. In order to seek compensation for the injury they have endured, people and organizations need to be cautious about safeguarding their reputations and initiating legal action against those who make unfounded accusations.

In *Friedrichsen v. Rodriguez*, No. 14-19-00850-CV (Tex. App. Oct. 26, 2021), the Court of Appeals upheld the trial court's judgment and noted that the false allegations were made to terminate Friedrichsen's employment and negatively impacting his business reputation. While agreeing with the same, the court further noted:

*"Prior to the date of this lawsuit, [Friedrichsen] attempted to explain that this allegation which concluded in [Friedrichsen] being wrongfully accused of "violation of Code of Conduct 2.2" of BBVA Compass Code of Conduct was false because it was based on incorrect information which led to unfair, unsubstantiated, and unjust investigative conclusion. [Appellees] were made known of the fact that the accusation is/was false. [Appellees] continued to insist on the falsity of the information which led to a false conclusion."*

Similar to the case at hand, false allegations have damaged the reputation of Mr. Patel and Kash Foundation and have hampered their ability to conduct business. The defendant published and made numerous false allegations with respect to Mr. Patel, such as that he allegedly had "attempted to overthrow the government", he had "planned the takedown of defenses at the Capitol on 1/6", and that he is "guilty of sedition". The defendant published such malicious and false statements for nearly three years on various social media platforms.

## Defamation Vs. Freedom of Expression

Defamation and freedom of expression are two concepts that often intersect but represent opposing principles within the legal framework. Defamation involves making false statements about an individual or entity that harm their reputation, leading to potential legal consequences such as civil lawsuits for damages. On the other hand, freedom of expression is a fundamental right that allows individuals to express their opinions and ideas without censorship or restraint by the government or other authorities. However, this right is not absolute and may be subject to limitations, such as when speech crosses the line into defamation by spreading false information that damages someone's reputation. Balancing these two principles requires careful consideration of factors such as the truthfulness of the statements, the context in which they were made, and the potential harm caused. While freedom of expression is crucial for a democratic society, it must be exercised responsibly to avoid infringing on the rights and reputations of others.

While commenting on how Freedom of Expression also requires its restrictions, the court noted in the case of Reighard v. ESPN, Inc., No. 355053 (Mich. Ct. App. May. 12, 2022) that:

*"But we are all losers when the law becomes so distorted as to eliminate all manner of accountability for those who would recklessly damage personal reputations ostensibly in the name of freedom of speech."*

This expression is in line with the principle that, along with the Freedom of Expression, the Plaintiff also has the right to freedom from impairment of reputation by false and defamatory statements. The court in Schlegel v. Ottumwa Courier, 585 N.W.2d 217 (Iowa 1998) noted that:

*"[t]he law of defamation embodies the public policy that individuals should be free to enjoy their reputation unimpaired by false and defamatory attacks. An action for defamation or slander is based upon a violation of this right."*

In the instant case, the defendant made statements recklessly disparaging the image of the plaintiff, Mr. Patel. He accused him of serious crimes including sedition and conspiracy against the government. The impact of these statements, made on the defendant's account with a large following of 11K+ users on Twitter alone, grows more serious in the account of the public office Mr. Patel holds. As an officer with the government, his reputation is extremely important for him which is heightened by the fact that Mr. Patel runs a non-profit organization, Kash foundation, a field where relationships are largely based on trust and integrity. The damage to his reputation impacts him personally and professionally including economic damages.

## Internet Defamation and Related Harm

In the physical world, it is easier to identify the person making a statement, and the damage caused can be assessed from the number of people that it might have reached. But in the case of internet defamation, the medium of publication is the internet, and the reach of libelous content involves a massive scope because that content can be read by almost anyone and it will remain ever-present on the internet. Consequently, the harm associated with internet defamation is exponentially more damaging and more complex. Unfortunately, Mr. Patel and Kash Foundation have experienced reputational issues that have emerged in the internet space.

The defendant has continuously posted harmful statements about the plaintiff on multiple platforms and continued to do so even after his Twitter account was suspended due to violation of its terms and services. On his return to the platform, he continued making more disparaging statements. He has also managed to make a sizable earning out of defaming and attacking Mr. Patel on the internet on various social media platforms. The statements directly call Mr. Patel's integrity and ethical reputation in question, thereby damaging his image as a public office holder and someone working in the social impact industry. This disparagement not only harms his reputation but also results in harm to his professional life and the foundation he built to give back. Hence, it has caused him economic and personal damage.

The affordability and convenient use of social media has facilitated the use of the platforms for the dissemination of information and, as in the present case, false accusations which have the power to severely harm a person's reputation and affect their living and livelihood. Social media platforms reach anyone without the traditional restrictions associated with geographical location. This content can be accessed by users located anywhere around the world, thus exponentially expanding the potential for damages realized by victims. Moreover, the global nature of social media platforms connects a worldwide audience to a variety of content, which can make a precise quantification of damage incurred by victims as a result of defamatory content impractical.

In response to the reputational attacks faced by Mr. Kashyap Patel and Kash Foundation due to false statements, digital reputation management emerges as a crucial solution. To counter the brunt of internet defamation faced by them, a rehabilitation program employing strategic online reputation management techniques such as monitoring and responding to online mentions, optimizing positive content, and addressing negative reviews or false allegations must be taken. Doing so will require a substantial investment of time and resources on the part of Mr. Patel.

## Online and Social Media Defamation of Mr. Kashyap Patel and Kash Foundation

Social media platforms and online defamation frequently intersect because they give people a public forum for sharing thoughts, ideas, and comments. Social media platforms, therefore, have the capacity to distribute false information quickly and widely, which renders them vulnerable to magnifying defamatory remarks.

As noted, the plaintiff was relentlessly defamed by the defendant through his online platforms, starting with his chat group *The Thinkin' Project.* The discord server advertised to battle misinformation, but was a channel used to precisely spread false accusations and defame public figures along with the plaintiff. The defendant made serious allegations on Twitter including that Mr. Patel "planner to overthrow the government", "planned the takedown of defenses at the Capitol on ⅛", and was "guilty of sedition".



Even after his account was shut down by Twitter, the defendant continued the disparagement through substack and paid podcasts. Not only did he maliciously defame the plaintiff but also

made financial gains through it. On restoration of his account, the torrent of defamatory statements continued.

With nearly a hundred and fourteen thousand followers on Twitter (now 'X') at the time, each of the defendant's libelous publications on social media easily accumulated tens of thousands of views. A few of his most viewed defamatory posts on Twitter have amassed as many as:

1. 77,000 views   (20 January 2023)
2. 83,000 views   (9 April 2023)
3. 173,000 views (18 May 2023)
4. 120,000 views (15 June 2023)
5. 41,000 views   (20 July 2023)
6. 72,000 views   (15 October 2023)
7. 70,000 views   (1 November 2023)
8. 50,000 views   (23 December 2023)
9. 91,000 views   (23 February 2024)

The defendant incessantly posted false and defamatory statements in relation to the Plaintiff, and the number of views can provide a brief insight into the sheer extent of reach of defamation. Further, Twitter (or 'X') being a globally accessible platform in turn implies that viewership of the posts was of a global scale, thereby subjecting the Plaintiff to defamation at an overwhelming international level. The defendant also used the video platform YouTube to spread the same narrative through his series, Radacalized Truth, which is also subscription based.



The actions of the defendant clearly show relentless, reckless, and malicious intent in defaming the plaintiff. These online comments may remain in cyberspace forever, blotting the reputation of the plaintiffs and causing economic and personal damage to them.

It is clear that the negative and false information disseminated by the Defendants on various social platforms was rooted in malice. While a positive social media reputation can help people gain the necessary spotlight and create opportunities, it can also be misused to harm innocent people when they are defamed by false representations of fact, as was the case with Mr. Patel and the Kash Foundation.

Especially in the case of the Foundation, its functioning is impacted by the posts because everyone, including prospective clients who search for the foundation and its leadership on the internet, now perceives them within the context of the false and damaging posts.

## Malice involved in case of Negative and Defamatory Statement

Malice refers to the state of mind behind the false statements made against an individual. It implies that the person making the false statements did so knowingly, with the intent to cause harm or injury to the reputation of the individual being targeted. Malice can take various forms, including personal animosity, spite, or a deliberate attempt to deceive or manipulate others. It establishes that the false statements were not merely the result of a mistake or misunderstanding but were made with malicious intent. This distinction is crucial because it elevates the seriousness of the defamation and can result in more severe consequences for the party responsible.

Malice establishes that the false statements were not merely the result of a mistake or misunderstanding but were made with malicious intent. This distinction is crucial because it elevates the seriousness of the defamation and can result in more severe consequences for the party responsible.

In the case at hand, the fact that the defendant started publishing defamatory statements against Mr. Patel on his substack account, a subscription based platform, sufficiently shows that the defendant had the malicious intent of profiting from such false statements.



This malicious intent is extended by virtue of the fact that the defendant, in order to drive traffic to his substack account, kept repeatedly posting on his Twitter account. The statements made continuously were to gain followers for the defendant and in turn profit from them across platforms. While the social groups created by Mr. Stewartson claimed to be for spreading knowledge and information, they were simply used as tools of defamation and to sully the reputation of well-known public figures. The clicks received due to the controversial nature of the statements helped spread them further and caused damage to Mr. Patel.

## Section 4: Heightened Scrutiny & Reputation Sensitivity in case of Public Office/Social Impact Industry*

The importance of trust and image for those in public office

Harm to the Social Work and Business Disparagement of Kash Foundation

*Disclaimer: Please note that I am not making any legal conclusions and/or providing any legal advice. All information, content, and materials available hereunder are for informational purposes only, in furtherance of the expert testimony being provided.*

## Significance of trust and image for those in public office

Reputation is a legal and natural right that is paramount to anyone. However, for someone holding public office, their image becomes all the more important. Integrity, trust, and accountability are the key standards for relationships and opportunities in any position, but as a public office holder, one is accountable to the people and the leaders and these qualities become sacrosanct. For someone like Mr. Patel, questions about his loyalty towards the nation and integrity deeply impact his reputation and affect how he is perceived personally and professionally. This impacts his job and the amount of trust the leaders place in him. This loss of reputation can hence lead to lost professional opportunities, impede his job functioning, and has a clear effect on the foundation he created and is evidently linked to.

Facebook and then Twitter and other platforms transformed the public sphere and the political landscape, allowing public office holders to communicate directly with the public they serve. Both sides can get their messages out for free and reach an even broader audience with paid advertising.

These have become platforms for public debate on all issues. Citizens can express their opinions and engage in political discourse with politicians and with other voters. Unfortunately, the platforms were soon abused and became a breeding ground for misinformation, at times on an "industrial scale." A single false headline can be seen by millions before the people it is about even learn of its existence, let alone dispute it.

One recent study found that 71 percent of users believed Facebook was the most toxic social media platform, but only 28 percent of them stopped using it as a result. For all the problems social media has caused, people cannot live without it. And as a result, anyone in the public eye needs to not only build their own profiles for communication but also maintain a clean image to be trusted to represent and work for the people. The malicious and reckless statements made by

the defendant have made this highly difficult for Mr. Patel to do, causing distress and damage to his job and professional life.

## Harm to the Social Work and Business Disparagement of Kash Foundation

Further to the harm caused to Mr. Patel, the disparaging comments have also affected the workings of the non-profit entity, Kash Foundation which provides legal aid and grants to individuals seeking action or litigation, especially for civil liberties.

Being a non-profit, the organization is run through the trust of donors and beneficiaries alike, who put their faith in the foundation and Mr. Patel. The harm to their reputation has made it harder for the foundation to secure and maintain donors and the allegations of corruption and mistrust has also affected their relationships with beneficiaries and other members of the society. This has included several people wanting to be removed from the mailing lists, and a tangible number of lost donors.

Mr. Patel shared how the false remarks have affected him and the foundation directly, "All the false remarks have become major news headlines. The foundation took a hit because the narrative has been that we are bribing people to testify. We are a 501(c)(3) that are helping people in need. We have given away a million dollars and would have probably given more because we would have fundraised more, had we not have to fight these baseless attacks."

Non-profit organizations and NGOs are judged based on their integrity and trustworthiness, and hence the statements made by the defendant, with malice and neglect, have deeply harmed its standing and work affecting present and future relations and opportunities.

**Section 5: The Nuances of Digital Reputation Repair**

What is Online Reputation Management (ORM)?

Building a Positive Reputation

Monitoring Online Mentions

Repairing a Damaged Reputation

## What is Online Reputation Management (ORM)

In today's digital age, our online presence plays a crucial role in shaping how we are perceived by others. Whether one is an individual or a business, online reputation can make or break one's success. This is where Online Reputation Management (ORM) comes into play. ORM refers to the strategy and tactics used to always present the clients' personal and/or professional brand in the best possible light on the internet. Generally speaking, it involves promoting positive brand messaging and managing negative criticism in the most appropriate manner.

Blue Ocean Global Technology defines ORM as the process of building, monitoring, and repairing the digital content that appears when any name the client is known by is searched for on the internet. Essentially, it is how one ensures that the trust, positive energy, and the relationship capital you have with professional and personal relationships are appropriately represented online. The emergence of social media allows negative content and false information to be shared easily and circulated among large numbers of internet users. This could be an offensive comment on one's manner of conducting business, a company's Facebook page, a fake or negative Google review, or a past legal issue.

Online reputation determines how one is perceived by others when they search for your name directly, or stumble across it online. Consequently, ORM proactively influences what information people will find.

## Building a Positive Reputation

The first step in ORM is to build a strong and positive online presence. This involves creating and maintaining professional profiles on various platforms such as social media, review sites, and industry directories. By providing accurate and engaging information about oneself or their business, one can establish credibility and trust with their audience. It is important to consistently update these profiles with relevant content and engage with the audience to foster a positive relationship.

Search Engine Optimization (SEO) can help with ORM, and it is essential for building a positive reputation. Reverse SEO is the cornerstone of ORM repair cases. ORM campaigns usually include a dedicated but flexible SEO strategy to achieve optimal results. When conducting an ORM campaign, websites and profiles are identified for consideration to post content. Those digital assets are then strengthened via target content through optimization techniques (such as backlinking) within the aforementioned SEO mandate.

An effective SEO strategy may include:

a. Optimizing pages of specific websites to appear atop of SERPs and rank for target keyword phrases;

b. Featuring genuine social media profiles that accurately represent who you are;

c. Optimizing articles, landing pages, and media to populate when an interested person Googles you or your brand's name; and

d. Influencing search engines to highlight positive content about you, while simultaneously pushing negative or irrelevant content down to where it is less likely to be seen.

Another strategy needed to implement to repair the digital reputation of Mr. Patel involves creating "backlinks" to strengthen the authority and ranking features of the digital content which was created and needs to be promoted. Despite our ongoing efforts and

comprehensive ORM plans, Google's algorithm prioritizes specific pages depending on content and other factors, including, for example, backlinks and the number of identical keyword searches on the internet. For example, past searches are accounted for in perpetuity within search activity. Because of the volume, diversity, and severity of the defamatory content created and published by Defendant, the reputation of Mr. Patel will continue to negatively impact search engine results relating to Mr. Patel for many years, if not decades, to come.

## Monitoring Online Mentions

Once the online presence is built, it is crucial to monitor what is being said about the individual or their brand across the internet. This includes keeping track of online mentions, reviews, comments, and social media conversations. Monitoring allows one to promptly address any negative feedback, resolve issues, and engage with their audience in a timely manner. By demonstrating that the individual or the business value customer satisfaction and are willing to address concerns, one can mitigate potential damage to their reputation.

Section 230 of the Communications Decency Act (CDA) of 1996 facilitates the development of the internet by encouraging innovations and new business models. Its primary goal is to safeguard the business owners of any "interactive computer service" from culpability for anything published by third parties. It states that "no provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider."

At the same time, one cannot ignore that the legal provision provides protection to internet companies, which may host trillions of communications, from being prosecuted into oblivion by somebody who feels offended by something published by a third party. The simple interpretation of this section is that if these companies are acting in "good faith," it permits social platforms to regulate the services by removing content that is obscene or that violates the standards of the service. The courts have widened the spectrum of this section, thereby expanding the scope of immunity that can cover criminal activities as well.

It is in this capacity that the United States harbors websites that want to provide a platform for controversial speech and a free legal environment for such expression. The extensive use of the internet, the expansion in the variety of "interactive computer services," the popularization of smartphones, and the introduction of social networking sites have all led to an explosive increase in online crime. Section 230 was a crucial step in the early era of internet services, but with the advancement in technology, it requires urgent amendments to ensure that internet companies

are transparent about their judgments while removing online content and when they should be obliged for the speech they modify. However, publication of libel is not protected by this clause, and as such, all defamatory posts made against Mr. Patel fulfill the elements of libel that invite the penalties prescribed therefor.

## Removal of content

Monitoring online mentions also involves content removal, which, where feasible, can be more permanent but may be prohibitively expensive because of the time investment required. Additionally, there are no guarantees for successful removal or deindexing of target links through search engines.

We invest resources in the study and development of all options for the negotiated, legal, and strategic removal of the information causing the negative reputational damage. With multiple pieces of damaging information, our approach to reputation management incorporates the following four removal strategies:

a. Negotiated (sympathetic) removal via direct outreach

b. Relationship driven removal via our network of agency & publisher partnerships

c. Strategic (technical) removal at source search engine or hosting company; and

d. Court or attorney assisted removal

## Repairing a Damaged Reputation

In some cases, despite one's best efforts, negative feedback or damaging information may surface online. When faced with a damaged reputation, it is important to take proactive steps to repair it. One approach is to address negative reviews or comments directly. Responding calmly, empathetically, and professionally can help mitigate the impact of negative feedback. By offering solutions or rectifying any issues, one can show that they are committed to customer satisfaction. Publishing positive testimonials, showcasing success stories, and promoting one's achievements can also help counteract negative information. By highlighting the positive aspects of the brand, one can rebuild trust and credibility.

Consistent with industry language and established practices, ethical and organic baseline suppression campaigns often require a minimum of one year for measurable and material progress, even under an aggressive mandate. Repairing the reputation of Mr. Patel is definitely a very difficult case relative to a 'baseline' campaign. The challenge of rehabilitating their online reputation reflects the depth and breadth of the web of defamatory information ruining their online identity.

Influencing search engine rankings must be gradual and organic. When the goal is influencing Google to favor (and disfavor) specific content, it is naturally counterintuitive to what the algorithm wants to rank. Generally speaking, Google seeks to provide a balance of information, and this of course refers to accounting for and integrating all perceived positive and negative information available for display within specific Search Engine Results Pages (SERPS).

An Online Reputation Management company would seek to mitigate as much negativity as possible to achieve sustainable results that are more permanent in nature. Links will move gradually in the client's favor, and there will also be natural partial reversals. This give and take is necessary, so as not to abruptly change the search results for a particular keyword otherwise it could be considered manipulation and 'blackhat' practices, and thus a violation of Google's terms and conditions.

Effective suppression focuses on making a growing group of positive current assets, and being sure they're stable, before strategically cross-pollinating that content. Integrated technical and public relations teams collaborate to evolve their approach and create priorities according to the most recent results throughout a Reverse SEO & Suppression campaign. The links will fluctuate up and down on the targeted keywords identified when repairing Mr. Patel's digital presence. The overall aim here is to create long-term stability. Until then, weekly, and even daily, fluctuations in search engine results are to be expected.

Parallel to any dispute resolution - litigation or otherwise - online reputation management tools are first employed to exercise damage control so that the reach of defamatory publications is contained. Thereafter, depending on whether the client is a public personality, follows the measures to engage with media outlets to provide accurate counter-information.

When dealing with online defamation within a niche sphere of business, several specific elements must be considered to account for the unique characteristics and dynamics of specialized industries, ensuring that reputation management strategies are more effective.

Awareness of industry-specific regulations and standards that might affect how defamation is managed and mitigated becomes crucial first and foremost. Specialized monitoring tools must be utilized to identify all defamatory mentions within the specific niche by identifying a set of relevant keywords and phrases. Customized and specifically tailored reputation repair strategies that address the specific concerns and values of the niche audience is another must. Choosing the objectively correct platforms for dissemination of messaging also becomes extremely relevant.

Even after the reputational harm has been effectively tackled, it becomes important to maintain the status quo by adapting reputation management strategies via continuous monitoring and garnering feedback from the niche community.

Given the importance of Mr. Patel's reputation, both individually and professionally, including the image of the Kash Foundation, it is imperative for him to undertake a rehabilitation program to rebuild and repair the reputation damaged by the defendant's actions. BOGT's comprehensive

ORM plan suggests the rebuilding of Mr. Patel's reputations via integration of numerous disciplines, including: SEO, public relations, content marketing, social media marketing and monitoring, community management, web analytics, and psychology and website engineering integrated with relevant content which is calculated to create a positive impact on a digital presence on social media, online review websites, forums, and blogs. The costs of the same add to the economic damages that the defamatory statements have created for Mr. Patel and Kash Foundation.

## Section 6: Legal Cases

Defamation

Defamation Per Se

Defamation through Media

Intent of Malice

Business Disparagement

*Disclaimer: Please note that I am not making any legal conclusions and/or providing any legal advice. All information, content, and materials available hereunder are for informational purposes only, in furtherance of the expert testimony being provided.*

## Internet defamation cases

1.  Bouveng v. NYG Capital LLC 175 F. Supp. 3d 280, 336-44 (S.D.N.Y. 2016)

**Facts in Brief:**

The plaintiff, Hanna Bouveng, brought this action against the defendants for quid pro quo sexual harassment, defamation, and two other claims. The plaintiff was employed with the defendant, wherein she alleged to have encountered several sexual overtures at the hands of Wey, her superior. On refusing to engage in sexual activities with him, Wey allegedly sent emails to her family and friends with the intention of humiliating her, and terminated her from her employment. Later, Wey published six Blot articles containing 66 defamatory statements.

**Decision and Award:**

The plaintiff was awarded $1.5 million on her defamation claim against all defendants, in addition to other damages awarded pursuant to her other claims in the suit. The jury further stated that "in the internet age in which we live, an individual's online presence is as important-perhaps more important early on—than her physical presence.

Acting out of pure malice and spite, Defendants used the internet to ensure that no prospective employer would interview Bouveng, much less hire her, by intentionally disseminating scores of the most professionally damaging lies and falsehoods about her that they could conceive of. She is entitled to compensation for the damage Defendants have caused to her professional reputation, and they will not be heard to complain that she has not listed the interviews she never obtained, or the jobs she lost, as a result of their egregiously defamatory falsehoods. Having caused the harm, Defendants cannot escape the liability."

**Ratio:**

It was held that "It]he unique nature of [defamation] cases is well established." "In actions for other torts there is generally... some standard by which the reasonableness of an award of

damages may be tested, but it is seldom so in actions for libel and slander where the elements of wounded sensibilities and the loss of public esteem play a part." Quoting from Yammine v. DeVita, 43 A.D.3d 520, 521, 840 N. Y.S. 2d 652 (3d Dept.2007).

"For that reason, the amount of such damages is peculiarly within the jury's provincel.] requiring prudence and restraint by a trial court in the exercise of its discretion over these awards." See Cantu v. Flanigan, 705 F. Supp.2d 220, 227 72 (E.D.N.Y.2010).

"Due to the uncertainties in calculating [non-economic] damage awards [in defamation cases], New York courts have consistently held that deference to the jury's findings is required in considering whether to reduce a jury's award." Citing Calhoun v. Cooper, 206 A.D.2d 497, 497, 614 N.V.S.2d 762 (2d Dept. 1994).

"Jurors are uniquely positioned to assess the evidence presented at trial and assign a monetary value to the plaintiff's non-economic damages." Cantu, 705 F. Supp. 2d at 227.

"In calculating non-economic damages in a defamation case, including humiliation, mental suffering and damage to plaintiff's reputation, a jury may properly consider a number of factors." Id.

Here, the jury was instructed to consider "plaintiff's standing in the community, the nature of the statement made about plaintiff, the extent to which the statement was circulated, the tendency of the statement to injure a person such as plaintiff, and all of the other facts and circumstances in the case." [Trial Tr. (Dt. No. 244) at 1629; see also Cantu, 705 F. Supp.2d at 227-28 (listing same factors)]

"Additionally, the jury may consider all future harm to the plaintiff's reputation, as well as any humiliation or mental anguish that plaintiff would suffer in the future." (citing Cantu, 705 F.Supp.2d at 228).

"Regarding the magnitude of punitive damage awards, due process requires that they be 'reasonable in their amount and rational in light of their purpose to punish what has occurred

and to deter its repetition Quoting Hill v. Airborne Freight Corp., 212 F.Supp.2d 59, 75 (E.D.N.Y.2002) aff'd.

**Relevance:**

In the present case, the plaintiff suffered injury as a result of defamatory statements made by the defendant over Twitter (now 'X') and Substack, as well as several interviews, which he allegedly did with the sole intention of defaming the plaintiff. The defendant's actions were purportedly driven by a desire to undermine the plaintiff's credibility and diminish his standing and reputation in the eyes of the general public and to undermine his business endeavors. Both cases highlight the devastating impact of defamatory statements and malicious actions on the injured party's reputation and livelihood.

2. Rombom v. Weberman 309 A.D.2d 844 (N.Y. App. Div. 2003)

**Facts in Brief:**

The defendant, A.J. Weberman, created and maintained three websites on the internet that displayed statements pertaining to the plaintiff, Steven Rombom. An additional defendant, Mordechai Levy, contributed material concerning Rombom to Weberman that was placed on one of the websites. Weberman and Levy were members of the defendant Jewish Defense Organization, Inc. The plaintiffs commenced the present action, inter alia, to recover damages for defamation, and for a permanent injunction preventing further publication of the alleged defamatory material on the websites.

**Decision and Award:**

The jury returned a verdict in favor of the plaintiffs, awarding compensatory and punitive damages. The jury further ordered a permanent injunction to the extent of "directing the defendants to remove any and all published statements about plaintiffs and plaintiff Rombom's family from their websites found by the jury to have been libelous, and to the extent possible, from all mirror [s]ites upon which defendants caused those statements to be published, and

prohibiting defendants from publishing any statements about plaintiffs and plaintiff Rombom's family found by the jury to have been libelous". The jury awarded $8,510,000 on the defamation claim.

**Relevance:**

In the present case, the defendant orchestrated the creation and maintenance of a Twitter account, a substack account among other sites containing statements targeting the plaintiff. The concerted efforts of the defendants to disseminate derogatory statements about Mr. Kashyap Patel were a deliberate attempt to harm his reputation, undermine his credibility and potentially impact his personal and professional standing. Both instances underscore the significant repercussions of defamation and deliberate efforts to damage an individual's reputation.

3.  Lansky v. Brownlee, 8th Dist. No. 105408, 2018-Ohio-3952, ¶ 23.

**Facts in brief**:

Gergley owns and operates a small political consulting firm, which specializes in polling. In early 2018, Ackison hired Gergley to provide services for her United States Senate campaign. Ackison retained Gergley's services through the completion of her campaign, which ended when she was defeated in the primary. After the campaign, Gergley and Ackison discussed working together on other ventures. The parties dispute the nature of the business relationship and who approached whom. Gergley and Ackison had a falling out in July or August, 2018. The parties had no further communications with each other after that time. On October 14, 2019, Ackison filed a Complaint against Gergley, asserting causes of action for defamation, defamation by innuendo, slander, slander per se, libel, libel per se, and false light invasion of privacy. Gergley filed an answer and counterclaim on December 20, 2019, alleging causes of action for defamation, false light, malicious prosecution, and abuse of process. Ackison filed an answer to Gergley's counterclaim on January 17, 2020.

**Ratio:**

"To establish defamation of a public figure, a complainant must also establish that the defendant acted with actual malice."

**Relevance:**

In the present case, given that Mr. Patel is a public figure, his burden shifts from merely proving harm caused by defamatory statements, to proving that the said statements were made with malicious or mala fide intent on part of the defendant. Mr. Patel can sufficiently prove that the statements were made maliciously since, especially, the defendant had sought to make defamation of Mr. Patel an avenue for income in and of itself.

4.  Murray v. Chagrin Valley Publishing Co., 2014-Ohio-5442, 25 N.E.3d 1111,

**Facts in brief:**

Patriots for Change held an organized protest decrying the firing of 156 employees of various companies owned by Robert Murray the day after the presidential election. Protesters alleged that Murray fired these individuals as a political stunt. Sali A. McSherry, a reporter for the Chagrin Valley Times, interviewed protestors and sought comments from Murray and Murray Energy. She was able to contact Gary Broadbent, an employee of Murray Energy. He provided her with a statement from Murray Energy as well as statements from Robert Murray. An article appeared in the newspaper on December 20, 2012, reporting on the protest and the response from Murray and Murray Energy. On January 3, 2013, an editorial written by Editor Emeritus David Lange appeared in the Chagrin Valley Times. It was critical of Murray and other appellants. The commentary was published in conjunction with a cartoon unfavorably depicting Murray that was penned by Ron Hill. Appellants filed a complaint sounding in defamation and invasion of privacy (false light) in the common pleas court of Belmont County, Ohio, on January 11, 2013.

**Ratio:**

Actual malice means that the statement was made "with knowledge of falsity or a reckless indifference to their truth."

**<u>Relevance:</u>**

In the case at hand, the defendant knowingly made false statements against Mr. Patel along with a glaring disregard as to whether or not they were propagating true or false statements, since the defendant's malicious motive was to make money from the defamatory posts.

## Defamation Per Se Cases

5.  Shapiro v. Massengill, 105 Md. App. 743 (1995) -

**Facts in Brief**

 The case of Steven A. Shapiro v. Alan D. Massengill, et al., No. 999, Sept. Term, 1994, before

 the Court of Special Appeals of Maryland, revolved around an employment dispute between

 two attorneys. Shapiro was terminated from employment by Massengill and his law firm

 because Shapiro did not disclose during negotiations that his former employer was under

 federal investigation for fraud. Shapiro filed suit, alleging breach of contract, wrongful

 discharge, and defamation. The jury ruled in favor of Massengill and his firm on all claims.

 Shapiro appealed, presenting five issues for review, including questions about the nature of

 the employment contract, duty to disclose investigations, and defamation.

 The factual summary revealed that Shapiro, while negotiating employment with Massengill, did

 not inform him of the investigation involving his former employer. Massengill terminated

 Shapiro upon learning of the investigation, despite Shapiro's explanation that he believed it to

 be insignificant and not pertinent to their discussions. Although Shapiro provided evidence

 from the Army's Special Agent confirming his innocence, Massengill opposed Shapiro's claim

 for unemployment benefits. The court's discussion focused on whether the contract was at-

 will or for a fixed term, among other issues raised by the parties.

**Ratio**

 The court differentiated between defamation *per se* and defamation *per quod*. In the case of

 words or conduct actionable per se their injurious character is a self-evident fact of common

 knowledge of which the court takes judicial notice and need not be pleaded or proved. In the

 case of words or conduct actionable only per quod, the injurious effect must be established

 by allegations and proof of special damage and in such cases it is not only necessary to plead

 and show that the words or actions were defamatory, but it must also appear that such words

 or conduct caused actual damage. Later in, **Metromedia, Inc. v. Hillman, 285 Md. 161, 163-64**

**(1979)**, the court explained further that this distinction goes not to the truth or falsity of a statement—it goes to damages.

## Relevance

The case of "Shapiro v. Massengill" provides insight into the differentiation between defamation per se and defamation per quod, highlighting the requirement of proving actual damages in cases of the latter. In the present case, the statements made are defamatory per se as they fall under the ambit of being naturally disparaging.

6.  K-Mart Corp. v. Washington, 866 P.2d 274, 282

## Brief Facts

The case arose from an incident in K-Mart store, where Washington went to buy hair care products but allegedly walked away not having found the products. K-Mart employees followed him on the ground that he had used the products and not paid for them. They handcuffed him and carried him away. Washington was charged for petty larceny, assault and battery, and resisting a public officer making an arrest. He was found innocent on all three charges. Subsequently he filed a case against K-Mart on the causes of false arrest, false imprisonment, assault and battery, defamation, malicious prosecution, negligent supervision and retention, conversion, and negligent and intentional infliction of emotional distress.

## Ratio:

In this case the court defined defamation per se according to Nevada law. It noted that any statement that "imputes a 'person's lack of fitness for trade, business, or profession,' or tends to injure the plaintiff in his or her business, it is deemed defamation per se and damages are presumed."

## Relevance:

As given in the case, in the instant case, the defendant made statements questioning Mr. Patel's integrity and loyalty while serving with the US government. These statements harmed his professional standings individually and in relation to the Kash Foundation, hence qualifying them as defamatory per se.

## Business Disparagement Cases

7.  Clark County. Sch. v. Virtual Ed., 125 Adv. Op. No. 31

**Brief Facts**

The dispute arose between Appellant Clark County School District (CCSD) and Clark County Education Association (CCEA), the teacher's union and Defendant Virtual Education Software, Inc. (VESI) on the conditions of employment for CCSD teachers. CCSD denied courses published by VESI to be counted as salary enhancement courses for the teachers of CCSD as per the employment agreement, given their concerns on the quality of the courses. VESI filed a case against CCSD on grounds of defamation and four other causes of action.

**Ratio**

The court asserted the essentials for business disparagement stating that, "To succeed in a claim for business disparagement, the plaintiff must prove: (1) a false and disparaging statement, (2) the unprivileged publication by the defendant, (3) malice, and (4) special damages. Id. Notably, the principal differences between defamation per se and business disparagement concern the elements of intent and damages. As opposed to defamation, which merely requires some evidence of fault amounting to at least negligence, business disparagement requires something more, namely, malice. Malice is proven when the plaintiff can show either that the defendant published the disparaging statement with the intent to cause harm to the plaintiffs pecuniary interests, or the defendant published a disparaging remark knowing its falsity or with reckless disregard for its truth."

**Relevance**

In the instant case, the essentials of business disparagement as stated are fulfilled as the defendant published several false statements on his socials continuously, without just cause or privilege. He did so maliciously and recklessly, notably to earn through gaining paid subscribers through the scandalous nature of the statements. The disparaging statements caused reputational damages to Mr. Patel as well as resulting in e economic damages through the loss

of donors or Kash Foundation and future prospects given the negative impact on his relationships and online image.

**Section 7: Assessment of Damages**

Rationale for Recommendation of Damages

Summary Findings

Damages

Economic Damages

Reputational Damages

Rehabilitation Damages

## Rationale for Recommendation of Damages

In my assessment of the defamation against Mr. Patel and the Kash Foundation, I have carefully considered the extent of the damages inflicted upon him individually and the effect on the functioning of the Foundation as a result of the defendants' defamatory posts, articles, and podcasts. The gravity of the situation and its repercussions on Mr. Patel and the Kash Foundation including loss of financial standing necessitates a thorough examination of the factors contributing to the recommended damages.

The false statements, as outlined previously, were not merely misleading; they were intentionally crafted to attack the integrity and loyalty of Mr. Patel to the country and the government. They threatened his credibility, especially in the context of the public office he holds and within the nonprofit industry extending to the damages faced by the Kash Foundation. The gravity of these false claims significantly amplifies the potential harm inflicted upon Mr. Patel and his foundation.

In professions where trust and integrity are imperative, including governmental positions and non-profit or impact-based organizations, defamatory content is exacerbated and the loss of reputation has a much greater impact on the personal and professional life of the defamed. Mr. Patel's professional standing has been severely affected, adding to the harm and economic losses. Additionally, the reputational damage has affected the ability of Kash Foundation to continue carrying out its social impact and affected donor and client relationships.

It is crucial to emphasize the malicious and reckless nature of the defamatory actions by Mr. Stewartson. The intentional spread of false information with the explicit goal of harming Mr. Patel's image underscores the need for substantial damages. The deliberate intent to cause irreparable financial and reputational harm is evident and cannot be overlooked.

## Summary Findings

**1.  Reputational harm and defamation of Mr. Patel and Kash Foundation.**

The statements, articles, and posts made by Mr. Stewartson were intended to defame the plaintiffs. The severe allegations including sedition and plotting against the government have caused major harm to Mr. Patel's reputation, who served in public service and now leads Kash Foundation in the aim to give back to the society further. The effect of these posts and the far reaching nature compound to amplify the damages sustained by Mr. Patel and his foundation.

**2.  Severe business and economic damages sustained as a result of defamation.**

As a result of the damaging statements, Mr. Patel has suffered in his community. The image he had built through the years by serving the community is now stained. The damages sustained translate directly into his opportunity set and ability to build new relations and approach donors, investors, and clients.

While the defendant earned from the scandalous nature of his statements, the negative narrative that was built around Mr. Patel and Kash Foundation severely damaged their business prospects and caused donors to back out. The widespread defamation is also likely to cause prospective harm, since anyone looking to engage with Mr. Patel personally or professionally, or as the leader of Kash Foundation, will come across the disparaging statement, forming their impression and leading to loss of further prospects.

**3.  Impact of reputation in the nonprofit industry.**

The non-profit industry is built on the values of trust, integrity, and interpersonal relationships. Organizations often rely on longstanding relationships and partnerships, and any erosion of trust can lead to a significant setback. Loss of reputation can lead to irreparable damage to the

reputation and subsequent loss of relationships with benefactors, donors, and even beneficiaries.

As mentioned, the statements which directly attack the integrity of Mr. Patel has also caused losses for Kash Foundation, impeded its functioning, and caused donors to drop out. Given the nature and importance of reputation as an asset in the industry, its loss can be fatal for organizations and leaders.

The grapevine effect which refers to the informal and unofficial communication network within an organization or community, can be responsible for the further losses that Mr. Patel and the Kash Foundation continue to face. This phenomenon is characterized by its rapid and unpredictable spread of information, often transcending hierarchical boundaries and organizational structures. Information transmitted through the grapevine can be both accurate and inaccurate, making it a double-edged sword in organizational communication. While it can serve as a valuable source of insight and feedback, it can also perpetuate misunderstandings, misinformation, and rumors. In Mr. Patel's case, it has negatively impacted him personally and professionally, impeding the functioning and success of the Kash Foundation.

4. **Statements made by Mr. Stewartson were defamatory per se and were made with malice.**

Defamation per se is the category of defamation which is highly damaging and hence assumed to be malicious by nature. This includes making false statements about an individual committing a crime, imputing an individual is infected with a communicable disease, alleging lack of integrity in employment, allegation of adultery among others.

In the present case, Mr. Stewartson made statements which were obviously harmful to Mr. Patel, imputing he betrayed the US government, plotted against it, and committed sedition among other severe claims. These statements clearly classify as defamation per se, which were made with malicious intent by the defendant with the sole purpose of defaming Mr. Patel and benefit

from the same. The malice is further manifested through the continual nature of the publishing of the defamatory statements, even after the defendant's Twitter platform was suspended. The malicious statements resulted in earnings for Mr. Stewartson through the paid subscription platform, Substack, but resulted in reputational and economic losses for Mr. Patel.

**5.  Damage was caused to the plaintiffs local, national and international reputation.**

Given the nature and scope of the social media platforms which were primarily used by the defendant to recklessly disparage the reputation of the plaintiffs, the impact of the defamation was wide. Posts on social media have a tendency to go viral internationally in a short span of time, regardless of the verifiability of the statement. Especially with the nature of the statements, the posts made by Mr. Stewartson could be seen with anyone beyond the United States, adding to the severity of the damages caused to Mr. Patel and his reputation.

**6.  Damage was caused to the plaintiffs' reputation, specifically in the United States.**

Mr. Patel held a public office and served extensively with the federal government since 2005. He has a carefully curated image which is important to his professional life, given the sensitive, confidential, and high authority nature of the work and people he engages with. Mr. Stewartson maliciously published false information about Mr. Patel's conduct while working with the US government, accused him of trying to overthrow the government, sedition, and other crimes against the US state. Such defamatory statements have caused harm to the reputation of Mr. Patel and by extension, Kash Foundation leading to reputational, emotional, and economic distress. The damage is heightened by the repetitive and continuous nature of the posting online across a series of platforms which rank across Google and other search engines affecting the image of the plaintiffs when anyone searched about them.

**7.  Rehabilitation measures are necessary to restore the lost reputation.**

Reputation is a right and asset for all individuals, but is especially important for the personal and professional opportunities for those in the public eye—including those holding public office and/or working in the nonprofit industry to give back. Given the defamation that Mr. Patel and Kash Foundation have been subject to, their online presence has been negatively impacted. Anyone searching about them online is likely to find the statements, creating a negative bias in their minds ultimately resulting in potential partners choosing to not work with Mr. Patel or contribute to Kash Foundation.

While undoing the entirety of the damage caused is not possible, to help the plaintiffs rebuild their online image and start to return to a state of normalcy, an online rehabilitation/reputation management campaign is necessary to repair and rebuild their digital reputation. Such a campaign will require a significant investment of time and resources from the plaintiffs' side.

## Damages

**Economic Damages**

The severe effects of the statements made by Mr. Stewartson have had a substantial impact on Mr. Patel, personally and professionally. Being accused of being a traitor and committing sedition for the government he served in a key position for years, has caused great emotional distress to him.

The statements made with reckless disregard for the truth and the consequences have had a significant effect on Mr. Patel's organization's and professional standing in the industry. The Kash Foundation is represented in front of prospects, donors, stakeholders, etc by its founder, Mr. Patel. When his reputation is impacted, it directly affects the reputation of the Foundation. The acts of the defendant resulted in monetary gains for him through the paid platforms he published the defamatory statements including Substack. On the contrary, they resulted in economic losses for the plaintiff, in the form of lost donors, funds, and prospective losses when someone looking to donate or collaborate with the Foundation sees the narrative created by his statements about Mr. Patel and the Kash Foundation.

As a public servant, Mr. Patel has built a foundational image of integrity and honesty which is a cornerstone in both his role with the government and in the nonprofit sector. This image has been deeply hurt by the defamation accusing him of working against the government, corruption, and crime. Apart from the business already lost, this impacts future opportunities and relationships. Mr. Patel will need to undertake efforts to restore his reputation, in real life with his connections, and online through reputation management, which as detailed further, will require investment of further resources.

In referring to economic damages caused by defamation and business disparagement, I reviewed several past cases. In Cantu V. Flanigan, the Plaintiff, Mr. Cantu, a successful industrialist in Mexico, was slandered and defamed through the circulation of an amicus brief prepared by the defendant, Mr. Flanigan, in which very serious allegations were made against Mr. Cantu. The

allegations included supposedly bribing the President, drug peddling, the killing of children due to involvement in drugs, etc. Due to this defamatory publication, Mr. Cantu lost many business deals that he could have otherwise converted. Mr. Cantu filed the complaint against Mr. Flanigan in this action alleging defamation and seeking economic damages to compensate for his lost contracts, noneconomic damages to compensate for the harm to his reputation, and humiliation and mental anguish. Mr. Cantu did not seek punitive damages. However, the court felt that this was a fit case on merit to award punitive damages (even though the Plaintiff did not seek them) to the tune of $150,000,000 in excess of presumptive damages of $38,000,000. Naturally, the facts of the above case differ from the present case of defamation, but the nature of the defamatory statements and the effect is similar: both Mr. Cantu and Mr. Patel were defamed by the respective Defendants, and suffered huge reputational, business, and personal losses due to the defamatory statements published. The jury awarded huge sums as compensatory as well as punitive damages to the plaintiff in the above case, recognizing that the reputational damage caused was immense.

In reviewing the past records and interviewing Mr. Patel during our analysis, I found that an average donation to the Kash Foundation from donors is $47 each from over 25,000 donors. In my conversations with Mr. Andrew Ollis, he shared how the defamation impacted Kash Foundation, "We had very successful fundraising program. What this person [the defendant] did essentially cut off an entire audience, an entire ecosystem from us." At Least 7 donors, with a total donation/gift of $25,000+ have stopped giving since the incident, with the defamation being a highly probable cause of the same because the narrative directly contradicts the benevolence of donating to a charitable cause.

Mr. Patel also shared, "We were going out to raise money as a non-profit and not a political entity. However, the remarks and subsequent news article took out nearly half of our donor market or prospects." Hence, the damage caused is not just to the foundation—including the administrative and overhead costs—which is liable to be claimed by the plaintiffs, but there exists a larger intangible loss to the community which Mr. Patel would have been able to help through the donations received which can not be remitted now due to the actions of the defendant.

Moreover, the attack on the reputation also affects Kash Foundation's ability to advertise and attract further donors given the false and misleading narrative framed around them, which a significant number of people now associate with them.

Given the prominence of Kash Foundation's profile and Mr. Patel's well-documented leadership journey to date, it's obvious that opportunities will be compromised. I affirm this based on experience addressing harmful defamatory content for over 100+ clients, both in the for-profit and non-profit sectors. I estimate that lost donors and opportunities for Mr. Patel is a tangible damage that must be restored.

**Reputational Damages**

Reputational damages form a part of presumed damages. Defamation causes a legal injury, which in itself assumes that a person has suffered damages as a result of the intentional attack on the reputation. The risks and ramifications of reputational damages are intense and intangible—i.e. there is no set standard to determine a liquidated value associated with it. Courts often rely on multiple factors when awarding damages to one's reputation. The fact that there is intentional (malicious) harm to reputation necessitates strong consideration for a reputational damage award.

In the present case, a significant component of Mr. Patel and the Kash Foundation's damages is the loss of reputation. Reputations are a business and individual's most valuable asset. They are hard to build. And as this case demonstrates, they can be compromised in a moment. Moreover, in the context of Kash Foundation where the organization depended largely on the trust of donors to contribute to the cause, their reputation was the cornerstone of their efforts and functioning. Notwithstanding the loss of donors, many people also chose not to associate with the foundation altogether, which can be seen by the multiple requests that were received by the Foundation to take them off the foundation mailing list. This is a clear indicator of the reputational damage caused to Kash Foundation.

New Voicemail

Transcription



In my conversation Mr. Patel, he mentioned the reputational harm and emotional distress he and his family faced as a result of the statements. "He (the defendant) used not only defamatory language but illegal language and associate me directly with it and call me so many false things, an agent of a foreign power, a kremlin asset, a felon, someone who orchestrated January 6th and put me and my family name on blast. There is no way to fully describe the detrimental effect that has on your ability to be a public person, which I am by nature of my work. It destroys your credibility with more than 50% of the people and media and it continues the fake news cycle."

It is also important to note, that Mr. Patel has already spent nearly $10K per month, in order to try to protect and repair his reputation personally. This investment, both monetary and time investment, included hiring a publicist, hiring lawyers, court fees, and advertising for the foundation to combat the false narrative and reestablish the work they are doing. This is in addition to the client resistance, as Mr. Patel shared that every time he meets with a new prospective client this situation comes up and hampers the relationship and precludes him from being hired. Moreover, these allegations have led to instances of death threats against Mr. Patel, which is one of the most severe consequences of the present defamation allegations.

I interviewed Mr. Patel and Kash Foundation's publicist, Ms. Erica Knight, who shared how from one post on social media the who storm spiraled for the worse with our media outlets picking it

up and using it as a source to damage the image of Mr. Patel. She noted how, since the media spiral, Mr. Patel had also stopped being invited to TV Shows and interviews, where according to her estimation, one can raise $20,000 in a single show. As the publicist, Erica regularly received negative emails to Mr. Patel about the allegations, the most vicious of which was sent in September 2021 and is included below. These threats not only showcase how the reputation of Mr. Patel was damaged in public view but also how it directly affects his well being.

Naturally, measuring the exact harm of losing one's professional reputation is incalculable. I have studied defamation and, again, been retained in dozens of defamation cases to assess damages. Reputation is a complex and intangible concept that varies from person to person and can be influenced by numerous factors. Different individuals may interpret the same defamatory statement differently, and there is no objective measure of reputation damage.

However, in my experience combining a number of factors can provide a solid structure for assessing damages based on the number of people the defamation reached as follows:

- Ring 1 (Inner Circle and Close Family) – These are people who know Mr. Patel intimately and while their perception may not have changed, the defamatory statement can still affect this relationship with him having to clarify the statements. This can also affect how friends perceive him within and outside the workplace.

- Ring 2 (Secondary Circle including Acquaintances, Co-Workers, Stakeholders, Clients, Donors) –  This ring is the circle that often affects false statement victims like Mr. Patel the most.  This is because these individuals all know and interact with him, either in a personal capacity or professionally, as founder of Kash Foundation and Fight with Kash on a regular basis, but do not know them well enough to know whether the false statements are true or not. This is the group that often hurts victims most because the interactions are tainted with distrust and questionability.

For Kash Foundation, this ring includes current donors and other stakeholders, who may

pull out or not place their trust in the nonprofit anymore, hurting not only the Foundation but ultimately also its beneficiaries. It also affects the morale of the foundation's employees and impedes its overall functioning.

- Ring 3 (Strangers scrutiny) – This is among the most nebulous groups as the posts, articles, and statements made to bring down Mr. Patel's image through severe and false allegations were open to be viewed by thousands of strangers online. These may have framed a negative perspective in the minds of people who saw them for the first time, causing intangible and invaluable damages. As mentioned, this can severely impede Kash Foundation's ability to continue to help others by the loss in trust future potential donors may face when they search the foundation and its leaders name online. A clear example of the harm caused in this ring is the instances that Mr. Ollis shared with us about dealing with rumors and statements at events, " We have to issue statements publicly and fairly often, usually at donor events, we have to correct what other people have said all the time. It's like a full time job."

The category of "defamation per se" exists precisely because calculating exact damages is impossible in cases such as these, especially those involving Ring 3. However, its breach certainly harms the individual and is an encroachment of their protected rights. That in itself, is grounds enough for the victim to be compensated. Adding the loss of opportunity due to the high possibility of people not engaging with the Kash Foundation after seeing the severe comments about Mr. Patel being unethical, criminal, and a traitor adds to the need for damages and compensation to the Plaintiff's business.

My understanding of a statement being defamatory per se references the case of Hancock v. Variyam, 400S.W.3d 59, 66 (Tex. 2013). A statement is considered defamatory per se if the statement injures a person in his office, profession, or occupation; charges a person with the commission of a crime; imputes sexual misconduct; or accuses one of having a loathsome disease. In the present case, the statements made by Mr. Stewatson against Mr. Patel falsely

accuse Mr. Patel of sedition, crimes, and attempting to pull down the government clearly substantiating that this is an obvious case of defamation per se.

While statements that are successfully proved as defamatory per se hold a firm ground and strengthen the victim's case, they also provide a framework for assessing the quantum and proof of damages that should be awarded by the court in this most 'text book' base of Internet Defamation. Where a statement has successfully been proved to be defamatory per se, the

Reputational Damage (Defamation Per Se): I recommended that the court consider these damages, especially given the severity and malicious nature of the series of statements posted on the various platforms. Adding the three reputational rings together, I calculate and estimate that damages for this category total no less than the range of **$1,500,000 - $2,000,000.**

**Rehabilitation Damages**

Recovery from reputational damages involves proactive measures. Businesses must not only address the false claims, reviews, and statements transparently but also actively engage with the online community to counterbalance the negative narrative. Implementing an effective online reputation management strategy, which includes encouraging satisfied customers or beneficiaries to leave positive reviews and monitoring online platforms for any further false reviews, is critical in rebuilding a positive image. Furthermore, the entire process usually takes a considerable amount of time and effort which should also be considered as factors for determining the damages.

The nature of this case necessitates a careful analysis in assessing restoration damages. Substantial investment of time and resources are required to rehabilitate Mr. Patel's reputation and rebuild and strengthen the Kash Foundation's image to mitigate the negative sentiment against them. Rehabilitative damages will help restore and rebuild Mr. Patel's reputation so that he can return to a more normal professional life and continue the impactful work he aims to do through his nonprofits.

As detailed above, a rehabilitation campaign in Mr. Patel's case will be based on the following timeline and resources. A rehabilitation campaign would likely cost and consist of the following components:

Restoration campaign required to help rehabilitate and rebuild the reputation of Mr. Patel and the Kash Foundation:

- Target keywords: 5

    a. Kashyap Patel Lawsuit
    b. Kashyap Patel Case
    c. Kashyap Patel Defamation
    d. Kashyap Patel Guilty of Sedition
    e. Kashyap Patel Kremlin Asset

- Target search engines: Google, Bing, Yahoo, Duckduckgo and Searchencrypt
- Creating positive digital assets: 500+
- Estimated timeline: 18 - 24 Months

Additional considerations for the campaign include:

Process

- An effective rehabilitation campaign requires ongoing analysis and testing. Close attention is given to a comprehensive yet fluid list of all search results that populate for a particular keyword. We will first focus on an initial group of 5 keywords.
- Our process is first applied to each keyword within the Google search engine. As the campaign yields results, a similar framework is implemented for the keywords on four other major search engines: Bing, Yahoo, Duckduckgo, and Searchencrypt.
- We will begin the image optimization process on the basis of media files provided by the client simultaneously that will impact progress on the standard search results as well.
- A web page with a higher authoritative number of backlinks features more prominently on the search results relative to similar websites without comparable interlinking

strength. Throughout the campaign, we will be using link building strategies to further strengthen the new digital assets created.

- A hallmark of our client experience is transparency. We provide monthly progress reports highlighting work performed and results starting at the end of the second month. While some of our strategies are proprietary, we often include backlinks, profiles, articles, and other tangible updates.

<u>Content & Publication</u>

- 500+ Positive Digital Assets will need to be created to counteract the negative sentiment against Mr. Patel and Kash Foundation. New positive links are required to rank. Given the limited scope of content that Mr. Patel may be comfortable with, we will likely have to engage a group of both internal writers and external PR professionals. Initial information for content creation, biographical information, topics, and sources will be identified and collected.

- Building and maintaining high authority profiles that can rank on specific Search Engine Results Pages (SERPS) will be one core element of our process.

- A plan for promotion and demotion of existing content within each keyword is required.

- Given the nature of Mr. Patel's professional obligations including working in confidence with beneficiaries, posting new social media content is a particularly sensitive issue. Yet, as most of the defamation took place through the defendant's social platforms which are high authority links and rank well, counter social media campaigns will be required to suppress them. We will have to work thoughtfully and patiently to leverage social media, which is usually a pillar of our campaigns. It will require a thorough understanding of Mr. Patel's image as a previous public office holder to authentically translate his offline integrity to his digital image.

Considering all the factors involved and the need for restoration and strengthening of Mr. Patel and Kash Foundation's online presence to protect against the defamatory narrative, the estimated costs for a rehabilitation campaign, inclusive of SEO and approved written, photo, video and public relations content by Mr. Patel:

**[Range $45,000 - $50,000 monthly] x for 18 - 24 months = $810,000 - $1,200,000**